IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ELLIOT AMQUIP, LLC d/b/a
POWELL AND SONS CRANE
RENTAL,

    *Plaintiff,*

v.

BAY ELECTRIC CO., INC.

    *Defendant.*

Civil Action No.: ELH-10-3598

## MEMORANDUM OPINION

This case arises from a dispute regarding payments for the rental of a construction crane.[1]

Complaint ("Compl.," ECF 1) ¶¶ 5-6. Plaintiff, Elliot AmQuip, LLC d/b/a Powell and Sons

Crane Rental ("AmQuip"),[2] leased the crane to Bay Electric Co., Inc. ("Bay Electric"), pursuant

to a written contract, for electrical work performed by Bay Electric at a construction project in

Decatur, Georgia. *Id.* Asserting that Bay Electric has failed to pay monies due and owing under

the contract, plaintiff filed suit against Bay Electric in Maryland on December 23, 2010, alleging

breach of contract (Count I). In the alternative, plaintiff seeks to recover based on unjust

enrichment/quantum meruit (Count II). Plaintiff also asserts a claim under the Georgia Prompt

Payment Act, GA. CODE ANN. § 13-11-1 *et seq.* (Count III).

Now pending before the court is Bay Electric's Motion to Transfer Venue to the United

States District Court for the Northern District of Georgia, Atlanta Division ("Motion," ECF 10),[3]

which AmQuip opposes. *See* Plaintiff's Opposition to Defendant's Motion to Transfer Venue"

---

[1] Jurisdiction is proper pursuant to 28 U.S.C. § 1332.

[2] AmQuip acquired Powell and Sons Crane Rental during the course of the parties'
dealings.

[3] The Motion was filed on March 15, 2011. On the same date, Bay Electric filed an
Answer (ECF 8).

("Opp'n," ECF 11).  On May 12, 2011, the Court held a telephonic Motion hearing. [4]  At the conclusion of the hearing, the Court granted both parties leave to submit additional declarations in support of their respective positions.  The matter is now ripe for resolution.

### Factual and Procedural Background

AmQuip "is a Delaware limited liability company" with its headquarters and principal place of business located in Trevose, Pennsylvania.  Compl. ¶ 3; Memorandum of Law in Support of Plaintiff's Opposition to Defendant's Motion to Transfer Venue ("Opp'n Memo.," ECF 11) 1-2.[5]  Bay Electric is a Virginia corporation "engaged in the business of providing "electrical contracting" services.  Compl. ¶ 4.  Although its "principal place of business is located in Newport News, VA.," *id.*, it maintains an office in Suwanee, Georgia.  *See* Memorandum in Support of Defendant's Motion to Transfer Venue ("Mot. Memo.," ECF 10-1) 2; Motion Ex. 2 ("Biagas Decl.," ECF 10-2) ¶ 4.  The Complaint also asserts that, "upon information and belief," Bay Electric "has engaged in [its business of electrical contracting] in the state of Maryland."  Compl. ¶ 4.

Of relevance here, Bay Electric was a subcontractor for a construction project at the Veterans Affairs Medical Center in Decatur, Georgia (the "Project").  Reply Ex. 1 ("Biagas Supp. Decl.," ECF 12-1) ¶ 7.  "The Project involved, *inter alia*, the installation and upgrades of electrical systems at the Veterans Affairs Medical Center."  Compl. ¶ 5.  M. C. Dean, Inc. "oversaw the Project from its Suwanee, Georgia office."  Biagas Supp. Decl. ¶ 7.

---

[4] The Court conducted the hearing by telephone because the attorneys are not located in Maryland.

[5] In the Complaint, plaintiff averred that AmQuip's principal place of business is located in Atlanta, Georgia.  But, in the memorandum submitted with its Opposition, plaintiff asserts that it made a mistake, and "intends to seek leave to amend its Complaint to address [this] after this Motion is decided."  Opp'n Memo. 2 n.1.

On or about March 12, 2009, AmQuip entered into a written contract with Bay Electric, AIA Documemt A401-2007 (the "Contract"), by which "AmQuip agreed to provide Bay Electric with, *inter alia*, 'all necessary supervision, labor, material and equipment, to provide miscellaneous crane lifts using a G.M.K. Grove (275 ton) crane.'"[6] Compl. ¶ 6 (quoting Contract § 8). The Contract reflects a business address for Bay Electric in Newport News, Virginia; a business address for AmQuip in Atlanta, Georgia; and identifies the Project as the Veterans Affairs Medical Center in Decatur, Georgia. Pursuant to the Contract, Bay Electric was to pay AmQuip at "the acknowledged crane rental rate of $350 per hour, with an 8 hour per day minimum, at 5 days per week ($2,800 per day = $14,000 per 5 day work week)." Compl. ¶ 7; *accord* Contract § 8. Further, the Contract provided that the crane rental would commence on July 6, 2009, and it set a "Substantial Completion Date" of September 4, 2009. Contract §§ 9.1, 9.3. Based on the rates and the estimated term, as set forth in the Contract, the "Contract sum" was set at $117,200, "subject to additions and deductions." Compl. ¶ 9; Contract § 10.1.

As the Project progressed, Bay Electric required use of AmQuip's crane for a period of time longer than originally anticipated. Compl. ¶ 10; *accord* Answer (ECF 8) ¶ 10. In particular, AmQuip alleges that Bay Electric required use of the crane "from approximately October 8, 2010 [sic] through February 11, 2010,"[7] as a result of "conditions, circumstances and delays for which AmQuip was not responsible." Compl. ¶ 10. According to plaintiff, when it invoiced Bay Electric for the crane rental, *id.* ¶ 11, "Bay Electric unjustifiably refused and failed

---

[6] Exhibit B to the Complaint contains invoices that suggest that defendant's use of the crane sometimes included a "crew," sometimes an "operator," and sometimes involved solely the crane.

[7] The invoices (plaintiff's Exhibit B) suggest that plaintiff intended to note the start period as beginning in 2009.

to pay . . . $124,889.20 in unpaid rental, freight and finance charges."[8]  *Id.* ¶ 12.  For its part, Bay Electric disputes that additional monies are owed to plaintiff for the extended use of the crane. In its view, the Contract was for a "lump sum," rather than "time and materials," as plaintiff contends.  *See* Opp'n Memo. 3.

The Contract does not include a choice of law of provision.  The negotiation and formation of the Contract is the subject of several declarations submitted by the parties.

John Drake, "branch Division Manager" of Bay Electric's Suwanee, Georgia office during the Project, submitted a Supplemental Declaration, dated May 18, 2011, on behalf of Bay Electric ("Drake Supp. Decl.," ECF 18-1).[9]  Drake claims that he and Eric Jones, who was then the "Project Manager/Estimator" for Bay Electric,[10] "conducted the initial negotiations for the pricing for the Contract" from Bay Electric's Suwanee office.  Drake Supp. Decl. ¶¶ 7-8. According to Drake, they "negotiated with Tom Newell, an employee of Powell Equipment Company, headquartered in Atlanta Georgia, and subsequently an employee of AmQuip after AmQuip acquired Powell Equipment Company."  *Id.* ¶ 8; *see* Drake Decl. ¶¶ 8-9.  Further, Drake claims that he and Jones "concluded the pricing negotiations with AmQuip in Georgia," which John Biagas, President and CEO of Bay Electric, then approved.  Drake. Supp. Decl. ¶ 9.  Of particular import, he states:  "Eric Jones and I negotiated the provision of the Contract concerning payment for the use of the crane."  *Id.* ¶ 9.  It was Drake's understanding, based on those negotiations with Newell, "that the provision provided for lump sum pricing."  *Id.*

---

[8]  AmQuip also complains that Bay Electric "has refused to participate" in arbitration, as "required by the Contract."  *Id.* ¶ 15; *see* Contract § 6.

[9]  This Supplemental Declaration augmented Drake's previous Declaration, dated April 14, 2011 ("Drake Decl.," ECF 12-2).

[10]  Drake states that Michael Morgan eventually replaced Jones as Project Manager/Estimator.  *Id.* ¶ 7.  Neither Morgan nor Jones is currently employed by Bay Electric.

In a Declaration of Eric Jones, dated May 18, 2011, submitted by Bay Electric ("Jones Decl.," ECF 17-1), Jones recounts that he and Drake negotiated the Contract with Newell in Georgia, including the "provision of the Contract concerning payment for the use of the crane." Jones Decl. ¶ 8. Jones states, *id.* ¶ 9:

> I understood, based on our negotiations with Tom Newell from AmQuip, that the provision provided for lump sum pricing. The agreement was that the crane would only be billed when the operator was present. If the operator was there operating the crane, then we would be charged the total rate for that time. The mobilization costs and demobilization costs would be charged per occurrence to set up and tear down the crane. I asked Mr. Newell if I needed to include hours that the crane sat idle (weekends, rain outs, etc) in my proposal and he said no. The original contract was for a not to exceed amount of hours of actual operation of the crane[]. The pricing provision was reviewed and approved by Mr. John F. Biagas.

John Biagas submitted a Supplemental Declaration, dated April 14, 2011. Biagas Supp. Decl. He claims that he and Barry Robertson, Bay Electric's Executive Vice President, "reviewed and approved" the "initial negotiations and pricing for the Contract." *Id.* ¶¶ 10, 12.

In a Declaration submitted by Tom Newell, dated May 23, 2011 ("Newell Decl.," ECF 21-1), Newell admitted that he "was involved in the initial pricing negotiations" between the parties. Newell Decl. ¶ 5. According to Newell, however, "[t]hese negotiations concerned only the applicable rate and duration of the rental, but did not include discussions as to whether pricing for the crane rental would be a 'lump sum' basis or a 'time and materials' basis." *Id.* ¶ 7. Rather, "discussions regarding the pricing model" were conducted by Stephen Stunder. *Id.* ¶ 8. Newell also avers that he attempted to resolve the parties' dispute with Morgan when it first arose, but Morgan insisted that the Contract was a "lump sum" one, and therefore Bay Electric would not pay for additional use of the crane, beyond the negotiated amount. Newell Decl. ¶¶ 16-17. When Newell and Morgan could not resolve the dispute, Stunder and Andy Cattin, AmQuip's "Corporate Credit Manager," attempted to resolve the dispute with John McLaren,

Bay Electric's "Director of General Construction," and Robertson. *See id.* ¶ 19; *see also* Declaration of Andy Cattin ("Cattin Decl.," ECF 19-1) ¶ 8. These efforts, conducted via email and telephone conference, were ultimately unsuccessful. *See id.*

In a Supplemental Declaration dated May 24, 2011 ("Stunder Supp. Decl.," ECF 20-1),[11] Stunder, "Vice President of Administration" for AmQuip, states that he negotiated the "terms of the Contract" on behalf of AmQuip with Robertson and Biagas of Bay Electric. Stunder Supp. Decl. ¶¶ 2, 8, 13. He avers: "Specifically, I had discussions and negotiations with Barry Robertson of Bay Electric's Newport News office about the pricing methodology for the Contract." *Id.* ¶ 9. According to Stunder, both he and Robertson "understood that the Contract amount would not remained [sic] fixed in the event Bay Electric required the crane for additional time beyond that set forth in the Contract." *Id.* ¶ 10.

Additional facts will be included in the discussion.

## Discussion

### I.

Pursuant to 28 U.S.C. § 1404(a), Bay Electric has moved to transfer venue to the Northern District of Georgia. Section 1404(a) states, in pertinent part: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

The "underlying purpose" of § 1404(a) is to enable courts to "prevent plaintiffs from abusing their privilege under [28 U.S.C.] § 1391 [for diversity cases] by subjecting defendants to venues that are inconvenient under the terms of § 1404 (a)." *In re: Volkswagen of Am., Inc.*, 545 F.3d 304, 313 (5th Cir. 2008). Put another way, § 1404(a) "tempers the effects" of the plaintiff's

---

[11] The Supplemental Declaration augmented Stunder's previous Declaration, dated April 1, 2011 ("Stunder Decl.," ECF 11-1).

choice of venue. *Id.* It "reflects an increased desire to have federal civil suits tried in the federal system at the place called for in the particular case by considerations of convenience and justice." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). To that end, its purpose is "to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'" *Id.* (citation omitted); *accord Mamani v. Sanchez de Lozada Sanchez Bustamante*, 547 F. Supp. 2d 465, 469 (D. Md. 2008).

In a motion to transfer venue pursuant to § 1404(a), the moving party bears the burden of showing, by a preponderance of the evidence, that transfer to another venue is proper. *See Costar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 770 (D. Md. 2009); *Lynch v. Vanderhoef Builders*, 237 F. Supp. 2d 615, 617 (D. Md. 2002). "In order to carry this burden, the movant should submit, for example, affidavits from witnesses and parties explaining the hardships they would suffer if the case were heard in the plaintiff's chosen forum." *Dow v. Jones*, 232 F. Supp. 2d 491, 499 (D. Md. 2002). Where the movant only provides "[m]ere assertions of inconvenience or hardship," it will not adequately have carried its burden. *Id.*

Based on the statutory language, the standard for a §1404(a) transfer can be distilled, as follows: "(1) the transferee court must be a court in which the action could have been brought initially; (2) the transfer must be convenient to the parties and witnesses; and (3) the transfer must be in the interest of justice." *Id.* (footnote omitted). Thus, "[a] motion to transfer under § 1404(a) . . . calls on the district court to weigh in the balance a number of case-specific factors." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).[12] These include: (1) the

---

[12] Bay Electric refers to an eleven factor test in its supporting Memorandum. Mot. Memo. 5. In its Opposition, AmQuip cites a four factor test. Opp'n Memo. 4. In response, Bay Electric asserts: "The parties do not disagree about the standard governing a Motion to Transfer." Reply Memorandum in Support of Defendant's Motion to Transfer Venue ("Reply," ECF 12) 5.

plaintiff's choice of venue;[13] (2) convenience of the witnesses; (3) convenience of the parties; and (4) the interests of justice. *See Mamani*, 547 F. Supp. 2d at 469; *Cross v. Fleet Reserve Ass'n Pension Plan*, 383 F. Supp. 2d 852, 856 (D. Md. 2005); *Lynch*, 237 F. Supp. 2d at 617. Other factors include the "local interest in having localized controversies settled at home" and the "appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action." *Stratagene v. Parsons Behle & Latimer*, 315 F. Supp. 2d 765, 771 (D. Md. 2004).

Notably, "[t]he decision whether to transfer is committed to the sound discretion of the trial court." *Mamani*, 547 F. Supp. 2d at 469; *see also In re Ralston Purina Co.*, 726 F.2d 1002, 1005 (4th Cir. 1984). As discussed, *infra*, the discretion afforded in regard to a motion under § 1404(a) is broader than that afforded under the doctrine of *forum non conveniens*. *See Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955).

## II.

Under 28 U.S.C. § 1404(a), the "preliminary" inquiry focuses on whether the civil action "might have been brought in the destination venue." *In re: Volkswagen*, *supra*, 545 F.3d at 312. In order to satisfy that requirement, venue in the transferee court must be proper, and that court must have personal jurisdiction over the defendant. *D2L Ltd. v. Blackboard, Inc.*, 671 F. Supp.

---

(...footnote continued)

Courts have set forth various formulations of the analysis under § 1404(a). The content of that analysis, however, remains largely consistent. *See, e.g.*, *Stratagene v. Parsons Behle & Latimer*, 315 F. Supp. 2d 765, 771 (D. Md. 2004); *see also* 15 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 3847, at 109 (3d ed. 2007) ("Although various federal courts have identified different numbers of factors, the judicial approaches are quite similar overall.").

[13] Some courts refer to the choice of "forum," rather than "venue." *See, e.g.*, *Mamani*, 547 F. Supp. 2d at 469 ("Courts are to consider the following factors: (1) the weight accorded to plaintiff's choice of *forum*; (2) witness convenience and access; (3) convenience of the parties; and (4) the interests of justice." (emphasis added)).

2d 768, 778 (D. Md. 2009). Clearly, this suit could have been brought in the Northern District of Georgia, the proposed transferee venue. Bay Electric transacts business in Georgia and maintains an office there. Memo. Mot. 5-6; *see also* Biagas Decl. ¶¶ 4-6. And, as Bay Electric asserts, "Georgia is the location where a substantial part of the events or omissions giving rise to the claims in the Complaint occurred." Memo. Mot. 6.

The analysis as to this threshold element follows.

### A. Venue

Federal jurisdiction in this case is predicated on diversity of citizenship. Under 28 U.S.C. § 1391(a), venue for such an action exists in:

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

AmQuip's claims are rooted in Bay Electric's construction work on the Project in Decatur, Georgia, which is located within the geographic boundaries of the Northern District of Georgia. Thus, § 1391(a)(2) has been satisfied. *See* N.D. Ga. App. A, at A-2 (stating that the Northern District of Georgia's Atlanta Division includes DeKalb County, the county in which Decatur is located), *available at* http://www.gand.uscourts.gov/pdf/NDGARulesAppA.pdf. Therefore, venue exists in the proposed transferee court.

### B. Personal Jurisdiction

"A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute, and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir.

2009).   The Georgia long-arm statute permits the exercise of personal jurisdiction over a nonresident defendant who "[t]ransacts . . . business" in the state, provided that the cause of action arises out of the transaction that occurred in Georgia.   GA. CODE ANN. § 9-10-91(1) (2010); *see Diamond Crystal Brands, Inc. v. Food Movers Int'l*, 593 F.3d 1249, 1264 (11th Cir. 2010) ("Georgia's long-arm statute permits jurisdiction where a plaintiff's cause of action 'arises out of' a nonresident defendant's 'transact[ion] of any business within [Georgia]'" (alteration in original) (citing § 9-10-91(1)).

This case involves Bay Electric's rental of a crane from AmQuip for the Project, which was located in Georgia.  Mot. Memo. 5-6.  Clearly, Bay Electric transacted business in Georgia, so as to satisfy the Georgia long-arm statute.

Moreover, the exercise of personal jurisdiction in Georgia would comport with due process.[14]   "Due process requirements are satisfied when in personam jurisdiction is asserted over a nonresident corporate defendant that has 'certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'"   *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Here, the dispute between the parties originated from a Contract that involved the rental of a crane for use in the Northern District of Georgia..  Mot. Memo. 6.  Bay Electric rented that crane for its use for electrical work that it performed in Georgia.  Apart from its work on that particular project, Bay Electric also "maintains an office and employees in Georgia."  *Id.*  Given the extent of Bay Electric's presence in Georgia, I am readily satisfied that Bay Electric had sufficient minimum contacts so as to satisfy the Due Process Clause of the Constitution.

---

[14] The Georgia long-arm statute "is not coextensive with due process."  *Diamond Crystal Brands*, 593 F.3d at 1261.

<u>III.</u>

Although Bay Electric concedes that venue is proper in this Court, it urges the Court "to transfer venue for the convenience of the parties and witnesses."[15] Mot. Memo. 3. Bay Electric claims, in part:

> [N]one of the operative facts involved in the dispute occurred in Maryland; neither AmQuip nor Bay Electric are headquartered in Maryland and none of the witnesses that will be called at the trial of this matter are located in Maryland. Instead, AmQuip is located in Atlanta, Georgia[16] and the Project at issue took place in Decatur, Georgia. Accordingly, any witnesses for AmQuip are located in Georgia.[17] Bay Electric is located in Newport News, Virginia and has an office in Suwanee, Georgia. Its employees reside in Newport News or nearby counties or cities in Virginia and near Suwanee, Georgia. The only connection to Maryland alleged in the Complaint is that "upon information and belief" Bay Electric "has engaged in [the business of electrical contracting] in the state of Maryland." Clearly, the "business" referred to has nothing to do with the contract between the parties, the Project, or the operative facts of this dispute.

*Id.* at 2 (citations omitted).

Plaintiff counters that its choice of venue "should not be disturbed." Opp'n Memo. 5. In opposing the Motion, plaintiff asserts, *id.* at 4:

> [T]he balance of factors for the Court to consider tilt heavily in favor of maintaining the action before this Court in the State of Maryland where: (a) Defendant concedes that Maryland is a proper venue; (b) plaintiff's choice of forum is afforded great weight; and (c) the key witnesses, being in Pennsylvania and Virginia,[18] are closer to Maryland than Georgia.

---

[15] Initially, Bay Electric argued for a § 1404(a) transfer because, *inter alia,* AmQuip "resides in the Northern District of Georgia." Mot. Memo. 3. However, as noted, *supra* n.5, plaintiff now claims that this allegation was a mistake. *See* Opp'n Memo. 2 n.1.

[16] At the time Bay Electric filed the Motion, AmQuip had alleged in the Complaint that its principal place of business was located in Atlanta, Georgia. Compl. ¶ 3. In its Opposition, it corrects that allegation, claiming its principal place of business is located in Trevose, Pennsylvania. Opp'n Memo. 2 n.1.

[17] As will be discussed, *infra*, Bay Electric identifies the following witnesses as located in Georgia: Drake and Morgan of Bay Electric, Newell of AmQuip, and Kevin Nockin and Keith Lupton of M.C. Dean.

[18] As discussed, *infra*, AmQuip appears to suggest that Stunder (in Trevose, Pennsylvania), Cattin (in Trevose, Pennsylvania), Robertson (in Newport News, Virginia), and

As noted, the Court must weigh several factors in considering a motion to transfer under § 1404(a). These include the convenience of the witnesses and the parties. *See Mamani*, *supra*, 547 F. Supp. 2d at 469.

A. *Witness Convenience and Access*

"Perhaps the most important factor to be considered by a court in passing on a motion to transfer is the convenience of the witnesses." *Cronos Containers, Ltd. v. Amazon Lines, Ltd.*, 121 F. Supp. 2d 461, 466 (D. Md. 2000); *accord Mamani*, *supra*, 547 F. Supp. 2d at 473.

In Count I of its Complaint, AmQuip avers that Bay Electric breached the Contract because of its "failure and refusal to pay . . . monies due and owing under the Contract" and its "failure and refusal to participate in mediation and arbitration." Compl. ¶¶ 17-18. In Count II, AmQuip seeks to recover under the theory of "unjust enrichment/quantum meruit," based on the "value of the equipment and services" that it supplied to Bay Electric. *Id.* ¶ 26. AmQuip alleges in Count III that Bay Electric's failure to pay monies due and owing to AmQuip constitutes a violation of the Georgia Prompt Payment Act. *Id.* ¶¶ 35-36.

Bay Electric contends that the factor of witness convenience weighs in its favor, as "none of the witnesses are located in Maryland." Mot. Memo. 7. Asserting that "interpretation of the Contract is only a part of the dispute between the parties," Reply 2, Bay Electric explains, *id*:

> In fact, also central to the dispute are the facts surrounding the actual use of the rented crane on the Project, change orders and additional work required by the United States Government ("Government"), and whether AmQuip was required to keep the crane on the Project for the number of days for which it claims compensation.[19] All of these issues are central to any contention of AmQuip's

---

(...footnote continued)

Biagas (in Newport News, VA) are the relevant witnesses. *See* Opp'n Memo. 6 (citing Stunder Decl. ¶¶ 8, 10-13, 22, 24).

[19] Bay Electric relies on Biagas's Supplemental Declaration, in which he avers that "the dispute between Bay Electric and AmQuip . . . has its genesis in and centers on certain additional

that it is entitled to recovery in quantum meruit (which measures recovery by the value of the benefit received by the defendant), as well as any claim under the Contract – should it prevail in its contention that the Contract is not a "lump sum" contract.

According to Bay Electric, testimony regarding these salient facts would come from "witnesses located in Georgia – the witnesses from AmQuip (Powell and Sons), Bay Electric and M. C. Dean, Inc. – who actually oversaw performance of the Contract."[20] *Id.* at 8. It represents that some are third-party witnesses who live and work in Georgia, for whom it would be a hardship to travel to Maryland for a trial, even assuming that compulsory process is available to compel their appearance in Maryland. *Id.* at 8-9. For example, Drake and Morgan allege that they have "first hand knowledge of the change orders issued by the Government, the additional work required, and payment from the Government for the change orders." Drake Decl. ¶ 12; Declaration of Michael Morgan ("Morgan Decl.," 16-1) ¶ 10. However, both are residents of Georgia and no longer employed by Bay Electric. Drake Decl. ¶¶ 1-2; Morgan Decl. ¶¶ 1-2. Both aver that "[t]he continued litigation of this case in Maryland would create great hardships and inconveniences" for them, as they would have to "leave [their] home[s] and current job[s] to travel to Maryland to attend a trial of this case." Drake Decl. ¶ 14; Morgan Decl. ¶ 12.

Moreover, Bay Electric posits that "the very fact that AmQuip asserts that the Contract . . . is governed by the Georgia Prompt Payment Act clearly indicates that at least some portion of the negotiations occurred in Georgia – as is confirmed by Mr. Drake," Bay Electric's former Georgia branch division manager. Reply 8. Further, it maintains that not "all of the

---

work performed on the Project at the request of the United States Government." Biagas Supp. Decl. ¶ 14.

[20] For instance, Drake identifies Kevin Nockin and Keith Lupton, employees of M.C. Dean, the entity with which Bay Electric had its contract (and the entity that oversaw the Project). Drake Supp. Decl. ¶ 12. He also states that, to the best of his knowledge, they both reside in Georgia. *Id.* Neither Nockin nor Lupton submitted declarations.

witnesses to the [Contract] negotiation are located in Virginia and Pennsylvania." *Id.* In support

of this assertion, it points to the preliminary negotiations conducted by Drake. *Id.* In addition,

Bay Electric observes that Jones, the Project Manager/Estimator who preceded Morgan and who,

by his Declaration, negotiated the provision of the Contract at issue, lives in South Carolina.

However, Jones does not aver in his Declaration that travel to either Georgia or Maryland would

create a hardship for him.

Finally, with respect to other factors bearing on witnesses and sources of proof generally,

Bay Electric argues, Mot. Memo. 8:

> [T]he factors involving relative ease of access to sources of proof, availability of
> compulsory process for attendance of unwilling witnesses, and the cost of
> obtaining attendance of willing and unwilling witnesses, possibility of a view of
> the premises (or in this case the Project or the crane), if appropriate, relative
> advantage and obstacles to a fair trial and other practical problems that make a
> trial easy, expeditious, and inexpensive all weigh in favor of transfer to the
> Northern District of Georgia.

In plaintiff's view, the suit turns only on the interpretation of the Contract. Opp'n Memo.

3. Claiming that the Contract is one for which payment is based on time and materials, AmQuip

insists that all of the relevant testimony "will come from those who negotiated and formed the

Contract, all of whom are currently located in Pennsylvania or Virginia."[21] *Id.* at 5-6 (citing

Stunder Decl. ¶¶ 8, 10-13, 22). In AmQuip's view, "Maryland is the most mutually convenient

forum for the witnesses, and far more convenient than Georgia." *Id.* at 6.

AmQuip relies on Stunder's Declaration and Supplemental Declaration, in which he

avers that "[i]t [would] be a hardship for Elliott AmQuip to have to litigate this matter in

Georgia," Stunder Supp. Decl. ¶ 17; that a transfer to Georgia "would create great hardships and

inconveniences" for AmQuip's "key witnesses," due to "the time and expense of travel"; and

---

[21] The parties seem to assume that the trial court will have to consider the negotiations
that preceded the execution of the Contract. But, they have not addressed which state's law
governs the breach of contract claim or the admission of parole evidence.

that those hardships "would be far more onerous than those that these witnesses might suffer if the matter proceeds in Maryland." Stunder Decl. ¶¶ 25-26. Stunder also avers that "the relevant documents and evidence likely to be admitted at trial are located in Pennsylvania and Virginia, not Georgia." *Id.* ¶ 27. Further, he states that, because "the cause for the extended duration" of the crane rental "was undisputedly beyond the control or responsibility of Elliott AmQuip, the primary matter to be resolved in this dispute is whether the terms of the Contract entitle Elliott AmQuip to compensation for the additional rental time, not any alleged performance issues associated with the crane." Stunder Supp. Decl. ¶¶ 5, 8. Therefore, Stunder claims that "the testimony of Mr. Jones, Mr. Morgan and Mr. Drake are not critical to this dispute." Rather, he cites the importance of his own testimony, noting that he is located in Trevose, Pennsylvania; that of Biagas, who is located in Newport News, Virginia; and that of Robertson, who "negotiated the terms of the Contract and the pricing methodology," *id.* ¶¶ 10-12, and is located in Newport News, Virginia. In addition to himself, Biagas, and Robertson, Stunder identifies Cattin, in Trevose, Pennsylvania, and McLaren, in Newport News, Virginia, the two individuals who handled the initial payment dispute, as two other "witnesses with the most relevant personal knowledge of the Contract and this dispute." *Id.* ¶ 13.

In his Declaration, Cattin identifies himself, Stunder, Biagas, and Robertson as "the persons with the most knowledge of this payment dispute." Cattin Decl. ¶ 11-12. Further, he avers that "[t]he details of the construction activities . . . are not relevant." *Id.* ¶ 14. Notably, he claims that transferring the case to Georgia "would create a great hardship and inconvenience" for him, because of the distance and expense associated with travel from Pennsylvania to Georgia. *Id.* ¶ 16, 17.

As indicated, Newell claims that he did not conduct pricing negotiations beyond "the applicable rate and duration of the rental," and that the "pricing model" negotiations were conducted by Stunder on behalf of AmQuip. Newell Decl. ¶¶ 7-8. Although he is based at AmQuip's Georgia office, Newell indicates that "it would not be inconvenient" for him to travel to Maryland for court proceedings. *Id.* ¶¶ 3, 22.

It is evident that *no* witnesses are located in Maryland. Even were the Court to accept AmQuip's argument that the only relevant testimony will come from those who negotiated the Contract, Drake declares that he negotiated the provision in issue on behalf of Bay Electric, and that a trial in Maryland would cause hardship. Jones also claims to have negotiated that provision of the Contract. Although he resides in South Carolina, he does not state that attending trial in Maryland would constitute a hardship. Morgan, Jones's successor, lives in Georgia, and he does assert hardship associated with travel to Maryland. None of these three individuals currently works for Bay Electric. [22]

Subsection (c)(3) of Rule 45 of the Federal Rules of Civil Procedure pertains to the quashing or modifying of subpoenas. FED. R. CIV. P. 45(c)(3)(A) provides, in part:

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

. . .

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where the person resides, is employed, or regularly transacts business in person—except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held . . . .

---

[22] Although Newell lives in Georgia, he disputes that travel to Maryland would cause any hardship.

If this case were tried in Maryland, Jones, Morgan, and Drake would fall within the ambit of FED. R. CIV. P. 45(c)(3)(A)(ii). Therefore, this Court might be unable to compel them to attend a trial in the District of Maryland.[23] *See also* 9A Charles Alan Wright et al., Federal Practice & Procedure § 2461, at 470 (3d ed. 2008) ("A nonparty who is not within the state in which the district court sits and not within 100 miles of the court may not be compelled to attend a hearing or trial."). By contrast, both Drake and Morgan, as Georgia residents, *could* be compelled to attend trial in Georgia.

At the very least, AmQuip's quantum meruit claim implicates matters beyond the Contract, such as the circumstances surrounding Bay Electric's acceptance of the benefit of AmQuip's crane and the change in work orders. Surely, the circumstances giving rise to Bay Electric's extended use of the crane are relevant. It is not enough, as AmQuip would have the Court understand, that both parties agree that the crane was on site in Georgia; the mere presence

---

[23] Rule 45(c)(3)(B)(iii) permits a court to quash a subpoena if it requires "a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial." However, Rule 45(c)(3)(B)(iii) is subject to Rule 45(c)(3)(C), which permits a court to compel appearance if there is substantial need for the testimony and there is assurance "that the subpoenaed person will be reasonably compensated."

Here, the parties disagree about whether the Contract was "lump sum" or "time and materials." Neither AmQuip nor Bay Electric has suggested that there is any concern about using deposition testimony at trial as a substitute for live testimony. *See* FED. R. CIV. P. 32. "Live testimony in the court room is touted as promoting candor in witnesses, and the opportunity to hear and observe witnesses live is seen as necessary for a jury to judge a witness' credibility." Edward F. Sherman, *The Evolution of American Civil Trial Process Towards Greater Congruence with Continental Trial Practice*, 7 TUL. J. INT'L & COMP. L. 125, 129 (1999). *See also Fluid Control Prods. v. Aeromotive, Inc.*, No. 4:09-CV-1667 CAS, 2011 U.S. Dist. LEXIS 13876, at *10 (E.D. Mo. Feb. 11, 2011) ("[E]ven videotaped depositions are not a substitute for live testimony, particularly where credibility may be important."). *But see Duncan v. IBM*, 95 Civ. 1785 (MBM)(MHD), 1996 U.S. Dist. LEXIS 18549, at *14 (S.D.N.Y. Dec. 13, 1996) ("Present videotaping techniques can provide jurors high-quality pictures and sound, and thus go far to replicating the experience of viewing a witness live in the courtroom.").

of the crane at the site of the Project does not establish plaintiff's right to recover for unjust enrichment.[24]

It is true that many of the witnesses are located in Virginia and Pennsylvania. But, it is also true that none of them is located in Maryland. Given the potential importance of the non-party witnesses, the Court finds that this factor tilts slightly in favor of transfer to the Northern District of Georgia.

### B. Convenience of the Parties

Bay Electric's principal office is in Virginia, it has an office in the Northern District of Georgia, and AmQuip's principal office is in Pennsylvania.[25] Bay Electric also notes that "there are no documents or other sources of proof located in Maryland," and that "[a] trial in Maryland will inconvenience all of the parties." Mot. Memo. 8. In its Reply, Bay Electric adds that both parties have offices in Georgia, and it suggests that "the hardship to [the parties, in requiring

---

[24] *See Ramond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp.*, 961 F.2d 489, 491 (4th Cir. 1992) ("To establish a right to relief on this basis under Virginia law, the claimant must show that (i) he rendered valuable services, (ii) to the defendant, (iii) which were requested and accepted by the defendant, (iv) under such circumstances as reasonably notified the defendant that the claimant, in performing the work, expected to be paid by the defendant."); *Memar v. Jebraeilli*, 694 S.E.2d 172, 175 (Ga. Ct. App. 2010) (Quantum meruit "'is an equitable doctrine based on the concept that no one who benefits from the labor and materials of another should be unjustly enriched thereby.'" (citation omitted); *Limbach Co., LLC v. City of Phila.*, 905 A.2d 567, 575 (Pa. Commw. Ct. 2006) ("The *sine qua non* of a claim in quantum meruit is unjust enrichment. Where unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred." (citation omitted)); *see also Smith v. Alacrity Servs., LLC*, No. JKB-10-3064, 2011 U.S. Dist. LEXIS 42829, at *8 (D. Md. Apr. 20, 2011) (stating the elements for unjust enrichment: (1) "plaintiff confers a benefit upon the defendant"; (2) "defendant knows or appreciates the benefit"; and (3) "defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return" (citing *Benson v. State*, 389 Md. 615, 651-52, 887 A.2d 525, 546 (2005)).

[25] As noted, Bay Electric originally argued that a transfer to the Northern District of Georgia would be convenient for AmQuip, because the Complaint identified Georgia as AmQuip's headquarters. Mot. Memo. 8. In its Reply, Bay Electric observed that, at the time of the filing of its Motion, "it appeared to be self-evident that both the witnesses and parties were located in Georgia and that Georgia was the most convenient forum." Reply 9.

them to litigate where both of their satellite offices are located,] is far less than that suffered by third party witnesses with no ties to Maryland." Reply 10.

AmQuip disputes that Georgia is more convenient to the parties. Noting that its principal office is in Pennsylvania and that Bay Electric's is in Virginia, it contends that "Maryland is a more convenient forum for the parties." Opp'n Memo. 6.

It is undisputed that none of the parties is located in Maryland. Moreover, the parties have virtually no connection with Maryland, although Bay Electric has previously "engaged in . . . business in the state of Maryland." Compl. ¶ 4. Nevertheless, given its office location in Georgia, Bay Electric believes that venue in Georgia would be more convenient to it as a defendant. On the other hand, AmQuip's principal office is located in Pennsylvania, which is some distance from Georgia. At best, the balance of this factor is neutral.

## C.  Plaintiff's Choice of Venue

Bay Electric argues that the only factor that "potentially could favor AmQuip" is the "substantial weight" typically accorded to a plaintiff's choice of venue. Mot. Memo. 6; *see* Reply 6. "However," argues Bay Electric, "in this case, that factor is not entitled to as much weight," because "the forum [of Maryland] has no connection with the matter in controversy." Mot. Memo. 6-7; *see* Reply 12. Noting that "Maryland is not the home forum of the Plaintiff or the Defendant," and that Maryland "is not the location of the nucleus of operative facts at issue in this case," Bay Electric posits: "[T]he entire transaction at issue took place either in Virginia or in Georgia, and pertains to the rental of a crane for use at a construction project located in the Northern District of Georgia." Mot. Memo 7.

AmQuip cites *Mamani*, *supra*, 547 F. Supp. 2d 465, for the proposition that "the plaintiff's choice of forum should only be disturbed where the balance of the other factors (*i.e.*,

witness convenience, party convenience and the interests of justice) 'is <u>strongly</u> in favor of the defendant.'" Opp'n Memo. 5. According to AmQuip, Bay Electric has not adequately demonstrated that the three other factors weigh strongly in favor of transfer, and therefore "AmQuip's choice of forum should not be disturbed." *Id.*

In considering a § 1404(a) motion, the *Mamani* Court said: "[U]nless the balance of factors 'is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" 547 F. Supp. 2d at 469 (quoting *Collins v. Straight Inc.*, 748 F.2d 916, 921 (4th Cir. 1984)). That standard has its origin in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).

In *Gulf Oil*, the Supreme Court considered whether federal courts have the "inherent power *to dismiss* a suit pursuant to the doctrine of *forum non conveniens*." *Id.* at 502 (first emphasis added). The Court explained the principle of *forum non conveniens* as "a discretion to change the place of trial on various grounds, such as the convenience of witnesses and the ends of justice." *Id.* at 507. *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 249 (1981). At the time, however, courts could not transfer cases within the federal juridical system; *dismissal* via *forum non conveniens* was the only option. Given the harshness of the remedy afforded by *forum non conveniens*, i.e., dismissal, it was perhaps not surprising that the *Gulf Oil* Court stated: "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." 330 U.S. at 508; *see also In re: Volkswagen of Am. Inc.*, *supra,* 545 F.3d at 313.

In 1948, a year after *Gilbert* was decided, Congress enacted § 1404(a), allowing courts to transfer cases (rather than dismiss them), to a more convenient federal venue within the unified federal system. In 1955, in *Norwood v. Kirkpatrick*, *supra,* 349 U.S. 29, the Supreme Court considered whether a § 1404(a) motion required application of the traditional *forum non conveniens* analysis. *Id.* at 30. The Court noted that, since § 1404(a)'s remedy was transfer and

not dismissal, the statute was not a mere codification of the common law doctrine of *forum non conveniens*. *Id.* at 31-2. The Court reasoned that, because a transfer of venue under § 1404(a) was less harsh than a dismissal under *forum non conveniens*, § 1404(a) was "intended to permit courts to grant transfers upon a lesser showing of inconvenience." *Id.* at 32. Of import here, it stated: "This is not to say that the relevant factors have changed or that the plaintiff's choice of forum is not to be considered, but only that the discretion to be exercised is broader." *Id.*

As to the plaintiff's choice of venue, the "rarely be disturbed" standard appeared in the case law in the years following the enactment of § 1404(a), apparently because some courts believed that § 1404 *was* a mere codification of the *forum non conveniens* doctrine. *See* CHARLES ALAN WRIGHT ET AL., *supra* n.12, § 3848, at 161. Although the Supreme Court clarified the matter in *Norwood*, by that time "the numerous cases requiring the balance to be strongly in favor of the moving party . . . had acquired a momentum of their own." *Id.* As a result, those cases continued to be "cited and quoted . . . often without [courts] recognizing that the original source of this theory was in connection with the *forum non conveniens* doctrine and that application of this standard to Section 1404(a) is doubtful." *Id.* (emphasis added).

For its part, however, the Supreme Court continued to be unequivocal. In the case of *Piper Aircraft Co. v. Reyno*, *supra,* 454 U.S. 235, the Supreme Court explained that § 1404(a) was intended "to be a revision rather than a codification of the common law." *Id.* at 253. According to the Supreme Court, § 1404(a) was created as a "'federal housekeeping measure,' allowing easy change of venue within a unified federal system." *Id.* at 254 (quoting *Van Dusen, supra*, 376 U.S. at 613). And, said the Court: "District courts were given more discretion to transfer under § 1404(a) than they had to dismiss on grounds of *forum non conveniens.*" *Piper Aircraft Co.*, 454 U.S. at 253 (citing *Norwood,* 349 U.S. at 31-32).

Notably, the *Piper Aircraft* Court discussed the "rarely be disturbed" standard in the context of *forum non conveniens*. *Piper Aircraft Co.*, 454 U.S. at 241. But, it *did not* refer to the standard in its discussion of § 1404(a). *See id.* at 253-54. Rather, the Court recognized that "the rule . . . for transfer under § 1404(a) was not the common-law [*forum non conveniens*] rule." *Id.* at 254 n.20. More recently, in construing the standard applicable to a § 1404(a) motion, the Fifth Circuit has observed that the broader discretion accorded to the district court "impl[ies] that the burden that a moving party must meet to justify a venue transfer is less demanding than that a moving party must meet to warrant a *forum non conveniens* dismissal." *In re Volkswagen*, 545 F.3d at 314.

To be sure, a plaintiff's choice of venue is entitled to substantial weight. *Lynch*, *supra*, 237 F. Supp. 2d at 617. However, consistent with the foregoing discussion, courts considering § 1404(a) motions have "significantly lessened" that weight "when none of the conduct complained of occurred in the forum selected by the plaintiff and said forum has no connection with the matter in controversy." *Id.*; *see also Mamani*, *supra*, 547 F. Supp. 2d at 473 ("[A] court need not accord the [plaintiff's venue] choice as much weight when the 'forum has no connection with the matter in controversy.'" (citation omitted)). Because Maryland has no connection whatsoever with the matter in controversy, I will, in my discretion, accord a lesser weight to AmQuip's choice of venue.

### D. The Interests of Justice

AmQuip maintains that both AmQuip and Bay Electric "benefit from" Maryland's laws and regulations governing corporate activity. In its view, "Maryland unequivocally has an interest to provide a forum so that the instant dispute between one of its own corporate citizens

and the parent company of another can be resolved." Opp'n Memo. 7.[26] In its Reply, Bay Electric disputes that the "mere fact that the parties conduct other, unrelated, business in Maryland . . . make[s] this a local controversy." Reply 11.

Without question, courts possess an "interest in having local controversies decided at home." *Stratagene*, *supra*, 315 F. Supp. 2d at 771. The allegations in this case arise from a Contract negotiated, in whole or in part, in Georgia, which provided for the rental of a crane that was used at a construction site in Georgia. Moreover, Georgia law will govern plaintiff's claim arising under the Georgia Prompt Payment Statute, GA. CODE ANN. § 13-11-1 *et seq*.

As to the breach of contract and quantum meruit claims, when a case is transferred pursuant to 28 U.S.C. § 1404(a), the transferee court applies the choice-of-law rules of the transferor court. *Van Dusen*, *supra*, 376 U.S. at 632-37. Therefore, if this case is transferred to the Georgia federal court, that court would apply Maryland's rule of *lex loci contractus* to both claims. *See Konover Prop. Trust, Inc. v. WHE Assocs., Inc.*, 142 Md. App. 476, 490-92, 790 A.2d 720, 728-29 (2002) (stating that *lex loci contractus*, "the place the contract was made," determines the choice of law for unjust enrichment and *quantum meruit* claims (emphasis omitted)).

Plaintiff alleges in the Complaint that the Contract was "formed" in Georgia. Compl. ¶ 34. In its Opposition, however, it claims that the terms were primarily negotiated in Pennsylvania and Virginia, and that it was "mistaken" in claiming that the Contract was negotiated in Georgia. Opp'n Memo. 2 n.1. In its Reply, Bay Electric maintains that at least some of the negotiations took place in Georgia. Reply 8. In any event, while the Court does not

---

[26] AmQuip does not elaborate as to the basis for its claim that Bay Electric is a corporate citizen of Maryland.

determine at this time where the Contract was made, it is almost certain that Maryland law will not apply, as Maryland had no involvement with the formation of the Contract.

The interests of justice include "'the court's familiarity with applicable law.'" *Lynch*, *supra*, 237 F. Supp. 2d at 618 (citation omitted).  In addition to its contractual and quantum meruit claims, plaintiff has alleged violation of the Georgia Prompt Payment Act.  While this Court certainly could preside over litigation involving Georgia law, surely federal district judges sitting in Georgia are more familiar with Georgia law.  Moreover, regardless of where the Contract was formed, it is clear that both sides have offices in Georgia; the crane was used at the Project in Georgia; and Maryland has no factual connection to the instant litigation.  Thus, this factor tilts quite heavily in favor of transfer to the Northern District of Georgia.

## Conclusion

Finding that this action could have originally been brought in the Northern District of Georgia, and that a transfer to the Northern District of Georgia will generally be more convenient to several of the witnesses, and in the interests of justice, the Court will transfer this action to the Northern District of Georgia.  An Order consistent with this Opinion will follow.


Date:  June 2, 2011                    _____/s/_____
                                       Ellen Lipton Hollander
                                       United States District Judge